## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **ASTRAZENECA PHARMACEUTICALS LP,** | |
| *Plaintiff,* | **No. 1:25-cv-00624** |
| *v.* | **Judge: _____** |
| **PETER NERONHA, in his official capacity as ATTORNEY GENERAL FOR THE STATE OF RHODE ISLAND, and DAVID A. BERGANTINO, in his official capacity as AUDITOR GENERAL OF RHODE ISLAND;** | |
| *Defendants.* | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      Section 340B of the federal Public Health Service Act, 42 U.S.C. § 256b, requires pharmaceutical manufacturers to "offer" their products at steeply discounted rates to an enumerated and clearly defined list of "covered entities." Such price controls can disincentivize innovation and destabilize markets, and Congress carefully crafted Section 340B and limited participation in the program to fifteen (and only fifteen) types of covered entities. Off-site, for-profit pharmacy chains that contract with covered entities to dispense 340B-discounted drugs were *not* included on the list of covered entities. Yet a number of States, including Rhode Island, have recently passed laws purporting to require manufacturers to offer 340B-discounted pricing for sales at an unlimited number of these so-called "contract pharmacies." These provisions impose immense costs on manufacturers—and generate big profits for pharmacies—yet produce little benefit for patients.

2.      Courts have rebuffed federal efforts to force manufacturers like AstraZeneca to offer 340B-discounted drugs for sales occurring through contract pharmacies. The U.S. Court of Appeals for the Third Circuit held that AstraZeneca's decision to restrict the offer of 340B-discounted drugs for contract pharmacy sales "do[es] not violate Section 340B," and it "enjoin[ed] [federal officials] from enforcing against" AstraZeneca any "reading of Section 340B" that would require AstraZeneca to make 340B discounts available for sales at "an unlimited number of contract pharmacies." *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 706 (3d Cir. 2023). The Third Circuit's decision was then incorporated into a permanent injunction, issued by the federal district court in Delaware, protecting AstraZeneca's right to proceed with its contract pharmacy policy.

3.      The D.C. Circuit has joined the Third Circuit, similarly "reject[ing] [the] position that section 340B prohibits drug manufacturers from imposing any conditions on" the offer of "discounted drugs to covered entities" who use contract pharmacies. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 459 (D.C. Cir. 2024). And the D.C. Circuit specifically upheld manufacturer policies requiring covered entities to provide claims data associated with 340B contract pharmacy orders, which allows manufacturers to prevent the improper diversion of their 340B-discounted medicines while imposing only "minimal" burdens on covered entities. *Id.* at 463-64.

4.      The State of Rhode Island took the opposite side of those disputes. It filed amicus briefs in the Third and D.C. Circuits arguing that "[m]anufacturers should not be allowed to unilaterally restrict covered entities' use of contract pharmacies and thereby eliminate the significant revenue" that it generates. Br. of Amici Curiae States, *Sanofi Aventis*, 2022 WL 1617655, at *9; *see* Br. of Amici Curiae States, *Novartis Pharms.*, 2022 WL 1644996, at *2 (arguing manufacturers who "limit[] 340B covered entities to using a single retail community pharmacy" are thereby "flout[ing] their statutory obligation to offer safety-net providers 340B-discounted prices on critical prescription drugs.").

5.      Dissatisfied with the scope of federal law, on June 27, 2025, Rhode Island enacted a statute seeking to achieve under state law precisely the same result that federal courts have resoundingly rejected. Known as S. 114, the Rhode Island statute requires pharmaceutical manufacturers to offer 340B-discounted pricing for sales at an unlimited number of contract pharmacies.

6.      S. 114 prohibits manufacturers from "deny[ing], restrict[ing], prohibit[ing], or otherwise interfer[ing] with, either directly or indirectly, the acquisition of a 340B drug by, or

delivery of a 340B drug to, a pharmacy that is under contract with a 340B covered entity." S. 114 § 5-19.6-5(a). And it defines a "340B drug" as a drug that "has been subject to any offer for reduced prices by a manufacturer pursuant to 42 U.S.C. § 256b and is purchased by a covered entity as defined in 42 U.S.C. § 256b(a)(4)." *Id.* § 5-19.3-2(1). The law thus extends Section 340B's price caps beyond the scope of the federal program to reach unlimited contract pharmacy sales—in effect, vastly expanding discounts under the federal 340B program to an entirely new category of transactions. This expansion under state law directly conflicts with federal law.

7.      S. 114 also prohibits a manufacturer from requiring covered entities or contract pharmacies, as a condition on its offer to sell drugs at 340B discounts, to submit claims data regarding 340B purchases. *Id.* §§ 5-19.3-3(a)(5), 5-19.3-5(c).

8.      Plaintiff AstraZeneca Pharmaceuticals LP brings this action to enjoin enforcement of S. 114. AstraZeneca argues that the law cannot validly be enforced against AstraZeneca for four separate and independent reasons.

9.      ***First***, S. 114 creates a conflict with—and thus is preempted by—federal law under the Supremacy Clause of the U.S. Constitution. *See* U.S. Const. art. VI, cl. 2. Rulings of the Third and D.C. Circuits make clear that the federal 340B statute does *not* obligate manufacturers to deliver discounted drugs to unlimited contract pharmacies. State officials may not impose this obligation on AstraZeneca either. Nor may any State engraft new, costly obligations under state law onto an existing federal benefits program—especially not one, like the 340B program, that involves nationally uniform standards and exclusive enforcement by federal agencies. And Rhode Island also may not preclude manufacturers from conditioning their sales offer under the federal program on the submission of claims data, which is necessary for manufacturers to meaningfully access the 340B program's audit and administrative dispute resolution procedures.

4

10.    **Second,** S. 114 creates a conflict with—and thus is preempted by—federal patent law. In *Biotechnology Industry Organization* (*BIO*) *v. District of Columbia*, the Federal Circuit squarely held that federal patent law "prohibits states from regulating the price of patented goods." 496 F.3d 1362, 1372 (Fed. Cir. 2007). Yet S. 114 does precisely that. It requires manufacturers like AstraZeneca to offer steeply discounted prices for the sale of their patented drugs, thereby extending federal price caps to an additional category of patented drug sales (contract pharmacy sales) for which federal courts have held that 340B discounts are *not* required.

11.    **Third**, S. 114 violates the Contracts Clause of the U.S. Constitution. *See* U.S. Const. art. I, § 10, cl. 1. The 340B program is enforced through agreements between drug manufacturers and the Secretary of the U.S. Department of Health and Human Services (HHS). 42 U.S.C. § 256b(a)(1). S. 114 substantially interferes with the operation of those agreements, and with manufacturers' rights and obligations thereunder, by imposing costly new obligations only on manufacturers who sign such agreements.

12.    **Fourth**, S. 114 violates the U.S. Constitution's Takings Clause. *See* U.S. Const. amend. V. Under the Takings Clause, "the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*," a prohibition that applies regardless of whether "*A* is paid just compensation." *Kelo v. City of New London*, 545 U.S. 469, 477 (2005). But S. 114 requires manufacturers like AstraZeneca to transfer their property (prescription drugs) to other private parties (covered entities and the pharmacies with which they contract). This forced transfer would be unlawful even if manufacturers were paid just compensation for these contract pharmacy sales. But in fact they are not: Manufacturers are compensated at steeply discounted prices, well below fair market value.

13.     AstraZeneca therefore seeks an order: (1) declaring that S. 114 is preempted by Section 340B; (2) declaring that S. 114 is preempted by federal patent law as applied to AstraZeneca's patented products; (3) declaring that S. 114 is unconstitutional as applied to AstraZeneca under the federal Contracts Clause; (4) declaring that S. 114 is unconstitutional as applied to AstraZeneca under the federal Takings Clause; and (5) enjoining Defendants Attorney General Peter Neronha, Auditor General David A. Bergantino, and any other Rhode Island officials from enforcing S. 114 against AstraZeneca through investigative demands, administrative proceedings, lawsuits seeking civil penalties or other relief, or in any other manner.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the Constitution of the United States) and 28 U.S.C. § 1338(a) (civil action arising under any Act of Congress relating to patents). An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-02.

15.     This Court also has inherent equitable powers to enjoin actions of state officials that contradict the federal Constitution or federal law. *See Ex parte Young*, 209 U.S. 123, 159-60 (1908); *accord, e.g.*, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

16.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because this action challenges a Rhode Island law that applies to and purports to regulate the sale of AstraZeneca's products in this District. AstraZeneca makes its drugs available and offers its products to multiple 340B-covered entities within this District, and these entities maintain multiple contract pharmacy arrangements. The challenged law (if not invalidated) would apply to conduct and property in this District, including AstraZeneca's, and would be subject to enforcement here.

17.     Venue is also proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendants maintain offices in this District, through which Defendants would enforce the law challenged in this action.

## PARTIES TO THE ACTION

18.     Plaintiff AstraZeneca Pharmaceuticals LP is a limited partnership organized under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware. AstraZeneca is a biopharmaceutical company focusing on the discovery, development, manufacturing, and commercialization of medicines. AstraZeneca participates in the 340B program.

19.     Defendant Peter Neronha is the Attorney General for the state of Rhode Island. In that role, he enforces the challenged legislation. This suit is brought against him in his official capacity only. The Attorney General maintains an office in Providence, Rhode Island.

20.     Defendant David Bergantino is the Auditor General of the state of Rhode Island. In that role, he is authorized to investigate complaints and take "appropriate actions to ensure compliance" with the challenged law. S. 114 § 5-19.3-7(1). He is also responsible for promulgating rules and regulations to effectuate the statute. *Id.* § 5-19.3-7(2). This suit is brought against him in his official capacity only. The Auditor General maintains an office in Providence, Rhode Island.

## FACTUAL ALLEGATIONS

### *The Federal 340B Program Caps Drug Prices for Enumerated Covered Entities that Provide Healthcare to Certain Underserved Populations*

21.     Section 340B of the Public Health Service Act established a federal program that "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities," known as covered entities, that provide healthcare to certain underserved populations. *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011).

22.     As a condition of receiving coverage and reimbursement for its drugs under Medicaid and Medicare Part B, a pharmaceutical manufacturer must enter into a pharmaceutical pricing agreement with the Secretary of HHS. 42 U.S.C. § 256b(a)(1). In that agreement, the manufacturer must "offer each covered entity covered outpatient drugs for purchase" at a specified discount price "if such drug is made available to any other purchaser at any price." *Id.* This is known as Section 340B's "must-offer" requirement. Manufacturers that "knowingly and intentionally charge[] a covered entity a price for purchase of a drug that exceeds the [340B discount price]" are subject to civil monetary penalties. *Id.* § 256b(d)(1)(B)(vi)(III). The 340B statute also regulates covered entities, which may not obtain 340B pricing on units of drugs for which a manufacturer pays a Medicaid rebate (known as "duplicate discounts"), nor resell or otherwise transfer such drugs to persons other than their patients (known as "diversion"). *Id.* § 256b(a)(5)(A), (B).

23.     Congress enacted Section 340B to give covered entities access to prescription drugs at below-market prices, thereby helping them serve their uninsured and indigent patients. H.R. Rep. No. 102-384, pt. 2, at 7 (1992). Balanced against its goal of increasing access, however, Congress also recognized the need to "assure the integrity of the drug price limitation program." *Id.* at 16.

24.     Congress has added to the list of 340B-covered entities over time, and today there are fifteen delineated categories of covered entities. 42 U.S.C. § 256b(a)(4)(A)-(*O*).

25.     Notably, Congress has *never* included contract pharmacies in the statutorily defined list of facilities that qualify as covered entities. Indeed, in drafting what would become the 340B statute, Congress considered proposed language that would have permitted covered entities to dispense 340B drugs through *on-site* contractors providing pharmacy services. *See* S. Rep. No.

102-259, at 1-2 (1992) (requiring manufacturers to provide a discounted price for drugs that are "purchased and dispensed by, or under a contract entered into for *on-site pharmacy services* with" certain enumerated covered entities) (emphasis added). But that provision was not enacted.

26.    The 340B program has its own federal enforcement provisions and administrative dispute-resolution process. Congress required the Secretary of HHS to establish an adjudicatory body to resolve disputes among participants in the 340B program, including "claims by covered entities that they have been overcharged for drugs purchased under this section [340B], and claims by manufacturers … of violations" by covered entities. 42 U.S.C. § 256b(d)(3)(A). Under that statutory mandate, the Health Resources and Services Administration (HRSA), the subagency of HHS that oversees the 340B program, has established "requirements and procedures for the 340B Program's administrative dispute resolution (ADR) process." 85 Fed. Reg. at 80,632 (Dec. 14, 2020). The ADR Rule authorizes panels of federal officers to resolve claims for "monetary damages," as well as other unspecified "equitable relief" sought by claimants. 42 C.F.R. § 10.21(a). And it empowers ADR panels to address a range of factual and legal disputes, including "those having to do with covered entity eligibility, patient eligibility, or manufacturer restrictions on 340B sales." 85 Fed. Reg. at 80,636.

27.    Importantly, before a manufacturer may access the ADR process, HRSA requires the manufacturer to first audit a covered entity. *See* 42 U.S.C. § 256b(d)(3)(B)(iv); 89 Fed. Reg. 28,643, 28,645 (Apr. 19, 2024) ("[M]anufacturers are required to audit a covered entity prior to filing an ADR claim"). And under HRSA regulations, a manufacturer may only initiate an audit when it can point to "documentation which indicates that there is reasonable cause," with "reasonable cause" defined to mean "that a reasonable person could believe that a covered entity may have violated" the prohibitions on diversion or duplicate discounting. 61 Fed. Reg. 65,406,

65,409 (Dec. 12, 1996). Thus, absent such "documentation," the ADR process is unavailable to a manufacturer.

28.     HRSA revised the ADR Rule last year. *See* 89 Fed. Reg. at 28,643. Among other things, the revised rule gives "340B ADR Panel[s]" responsibility to resolve disputes related to "overcharge[s]," which include claims that a manufacturer has "limited [a] covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling prices." 42 C.F.R. §§ 10.3, 10.21.

### *Contract Pharmacy Use Leads to Abuse and Profiteering*

29.     At the time of Section 340B's enactment, manufacturers provided discounted drugs directly to covered entities, who in turn provided them to their patients for free or at cost.

30.     Section 340B does not require manufacturers to make 340B-discounted drugs available for sales at or through contract pharmacies—or indeed, for sales at *any* entity not specifically enumerated in the statute. In the decades since the enactment of the program, however, HRSA has issued two non-binding "guidance" documents purporting to authorize covered entities to enter into agreements with contract pharmacies to dispense outpatient drugs purchased at a discount under Section 340B.

31.     In 1996, HRSA issued guidance providing that "eligible covered entities that do not have access to appropriate 'in-house' pharmacy services" could now access 340B discounts for sales at a *single* outside pharmacy of its choice. 61 Fed. Reg. 43,549, 43,555 (Aug. 23, 1996) (1996 Guidance). Even after that guidance, however, contract pharmacy use was rare: By 2000, only 47 covered entities (out of more than 11,500) had registered contract pharmacies with HRSA

32.     Then, in 2010, HRSA released new guidance stating that covered entities could now access discounts for sales at "multiple pharmacy arrangements"—that is, an *unlimited* number of contract pharmacies, without any geographic limits—"as long as they comply with guidance

developed to help ensure against diversion and duplicate discounts and the policies set forth regarding patient definition." 75 Fed. Reg. 10,272, 10,273 (2010 Guidance). The 2010 Guidance thus purported to authorize a covered entity to enter into an unlimited number of contract pharmacy arrangements anywhere in the United States, and purported to require manufacturers to offer 340B discounts for unlimited sales at such contract pharmacies.

33.    The 2010 Guidance triggered a massive surge in the number of contract pharmacy arrangements through which covered entities receive 340B discounts. *See Novartis Pharms.*, 102 F.4th at 457 (noting a "significant expansion"). In 2018, the Government Accountability Office reported that the number of contract pharmacies had ballooned from 1,300 in 2010, to nearly 20,000 in 2017. U.S. Gov't Accountability Off., GAO-18-480, *Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement* 2 (June 2018) (2018 GAO Report), https://www.gao.gov/assets/700/692697.pdf. These numbers have continued to grow. Today, more than 33,000 different pharmacies participate in the 340B program, with more than 194,000 individual contracts. Adam J. Fein, Drug Channels Inst., *Exclusive: For 2023, Five For-Profit Retailers and PBMs Dominate an Evolving 340B Contract Pharmacy Market* (Jul. 11, 2023), https://www.drugchannels.net/2023/07/exclusive-for-2023-five-for-profit.html. The vast majority of these contract pharmacies (75% as of 2018) are for-profit retail chain pharmacies; and the five largest national pharmacy chains—CVS, Walgreens, Walmart, Rite-Aid, and Kroger— accounted for a combined 60% of all 340B contract pharmacies, even though these chains represent only 35% of all pharmacies nationwide. 2018 GAO Report at 20-21.

34.    Make no mistake, the boom in contract pharmacy sales has been fueled by the prospect of outsized profit margins on 340B-discounted drugs. As the D.C. Circuit explained:

> While some contract pharmacies maintain separate inventories of section 340B drugs, most fill prescriptions from inventories that intermingle discounted and non-

discounted drugs. Only after dispensing the drugs do these pharmacies attempt to discern whether individual customers were patients of covered entities—in other words, whether individual prescriptions were eligible for the discount. Many pharmacies outsource this determination to third-party administrators, who often receive a larger fee for every prescription deemed eligible for the discount. Once the pharmacy or the administrator categorizes a certain number of prescriptions as eligible, the pharmacy places an order to replenish its section 340B purchases. The covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate. Each of these actors thus has a financial incentive to catalog as many prescriptions as possible as eligible for the discount.

*Novartis Pharms.*, 102 F.4th at 457-58; *see* Decl. of Krista M. Pedley ¶¶ 5-9, *Sanofi-Aventis U.S., LLC v. HHS*, No. 3:21-cv-634 (D.N.J. June 24, 2021), ECF No. 93-2. Since a 340B discount is applied for the contract pharmacy sale—even though the sale has *also* benefitted from the full insurance reimbursement—this dynamic results in substantial arbitrage revenues. *See Sanofi*, 58 F.4th at 699 ("[T]hey turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount.").

35.    This approach to distributing 340B-priced drugs is commonly known as the "replenishment" model, and it is now the dominant model used by covered entities. Under the replenishment model, the experience of an insured patient purchasing medicine from a contract pharmacy is identical regardless of whether the patient is dispensed a drug purchased at the 340B price or a drug purchased at the commercial price. When an insured patient purchases medications at a contract pharmacy, the patient generally pays the copay set by the patient's insurer, and the insurer pays the rest of the commercial price—even if the dispensed drug had been acquired by the pharmacy at the 340B price, or will subsequently be reclassified as a 340B-priced sale through a replenishment model.

36.    When an insured patient fills a prescription, and the patient and his or her insurer together pay the pharmacy the commercial price, the difference between the commercial price paid for the medication and the 340B price it was purchased at generates revenue. Covered entities

employing the replenishment model often use the terms "340B savings" or "340B revenue" to refer to the revenue generated when insured patients are dispensed drugs purchased at the 340B price and the pharmacy receives payment from the insurer and the patient at the commercial price.

37.     Typically, covered entities' agreements with their contract pharmacies provide that the covered entity will pay the pharmacy a dispensing fee for each drug sale the pharmacy makes under their contract pharmacy arrangement. Although their arrangements with covered entities vary, contract pharmacies generally charge a "dispensing" fee of approximately 20% of the gross sales price for their role in 340B sales.

38.     In addition to replenishing 340B sales as described above, a growing number of contract pharmacies—including large, for-profit pharmacies like Walgreens, CVS, and Kroger—are now employing an approach that is even more brazen about using the 340B program to generate arbitrage revenue: so-called "credit replenishment." Under this approach, the contract pharmacy's inventory is "virtually replenished" through a paper fiction—namely, by recharacterizing the prior transaction to make it appear as if the previously dispensed unit had been bought at the 340B price originally. To do so, the wholesaler simply credits the contract pharmacy for the commercial price; charges the 340B price to the covered entity; and then requests a refund from the manufacturer for the difference between the wholesale and 340B prices. This is a purely financial maneuver: No new product is purchased, nor is any product distributed as a result. Contract pharmacies have contractual agreements with covered entities explicitly designed to implement credit replenishment, and contract pharmacies solicit covered entities consent to enter those agreements.

39.     Under the replenishment model, as Senator Chuck Grassley put it in a letter to HRSA, for-profit pharmacies "are reaping sizeable 340B discounts on drugs and then turning around and upselling them to fully insured patients covered by Medicare, Medicaid, or private

health insurance in order to maximize their spread." Letter from Sen. Chuck Grassley, S. Comm. on the Judiciary, to Mary K. Wakefield, Adm'r, HRSA (Mar. 27, 2013), https://www.grassley.senate.gov/download/2013-03-27-ceg-to-hrsa-340b-oversight-3. Contract pharmacies routinely siphon off 20-30% of this "spread," leading them to retain up to $5 billion in annual profits from 340B sales. *See* Neal Masia, *340B Drug Pricing Program: Analysis Reveals $40 Billion in Profits in 2019*, Alliance for Integrity & Reform (May 2021), http://bit.ly/4bM7sHE; Laura Joszt, *340B, Biosimilars, and More in the Future of Specialty Pharmacy*, Am. J. of Managed Care (May 4, 2022), https://bit.ly/4c61Do6 (five contract pharmacies "earn about $3.2 billion in gross profits from 340B"); Walgreens Boots Alliance, Inc., Form 10-K (Oct. 15, 2020), https://bit.ly/3KveDrI (noting that "[c]hanges in pharmaceutical manufacturers' . . . distribution policies . . . in connection with the federal 340B drug pricing program[] could . . . significantly reduce [Walgreens's] profitability"); Rebecca Pifer, *Hospitals, PBMs Say Drugmaker Restrictions on 340B Discounts Stifling Finances*, HealthcareDive (May 5, 2020), https://bit.ly/3P9xmdF (reporting that CVS Health "said its 340B product lines were stagnant" after contract-pharmacy restrictions were imposed).

40.    Although some of the money generated through contract pharmacy sales is passed on to covered entities, most of these profits are *not* going to federally qualified health centers or other federal grantees that provide services to underserved populations (such as black lung clinics, hemophilia treatment centers, urban Indian health organizations, and AIDS drug purchasing assistance programs). Instead, they are being captured by 340B hospitals and contract pharmacies, which are responsible for nearly 90% of all 340B purchases. Aaron Vandervelde et al., Berkeley Rsch. Grp., *For-Profit Pharmacy Participation in the 340B Program* 7 (Oct. 2020), https://bit.ly/3owtUwa.

14

41.    Nor are these huge profits being passed on to patients. For example, in response to a 2018 GAO survey, 45% of covered entities admitted they do not pass along *any* discount to *any* patients that use *any* of their contract pharmacies. 2018 GAO Report at 30. As for the remaining 55%, the GAO noted that entities using contract pharmacies may provide discounts to patients only in limited cases. *Id*. Likewise, the HHS Office of Inspector General found in 2014 that some contract pharmacies do not offer 340B-discounted prices to uninsured patients at all. HHS-OIG, *Memorandum Report: Contract Pharmacy Arrangements in the 340B Program*, OEI-05-13-00431, at 2 (Feb. 4, 2014) (2014 OIG Report), https://oig.hhs.gov/oei/reports/oei-05-13-00431.pdf. As a result, "uninsured patients pay the full non-340B price for their prescription drugs at contract pharmacies." *Id.* By contrast, the GAO noted that 17 of 23 of the surveyed covered entities that had *in-house* pharmacies reported offering discounts at those pharmacies. 2018 GAO Report at 30 n.46. Most recently, a report by the Senate Committee on Health, Education, Labor & Pensions found that major covered entities do not directly pass on 340B discounts to patients, with one entity stating to the Committee that "reducing patients' drug expenses is not the purpose of the 340B Program." S. Comm. on Health, Educ., Labor & Pensions, *Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program* 9 (Apr. 2025), https://www.help.senate.gov/imo/media/doc/final_340b_majority_staff_reportpdf.pdf.

42.    In fact, some contract pharmacy service agreements authorize contract pharmacies to *deny* services to uninsured patients

43.    In short, the widespread proliferation of contract pharmacy arrangements since 2010 has transformed the 340B program from one intended to assist vulnerable patients into a multi-billion-dollar arbitrage scheme.

44.     At the same time, the explosive growth of contract pharmacy arrangements also has facilitated increased diversion and duplicate discounts. *See Novartis Pharms*., 102 F.4th at 458. HRSA's 1996 guidance sought to limit abuse of the program by adopting safeguards for contract pharmacy use, instructing that a covered entity "should establish [a] prior authorization protocol, assuring that the individual's status as a patient of the entity is confirmed by the entity in advance of [receiving] product." 61 Fed. Reg. at 43,553. And the 2010 guidance, in authorizing use of multiple contract pharmacies, identified several further safeguards as "essential elements to address in contract pharmacy arrangements," including that covered entities must "maintain title to the drug." 75 Fed. Reg. at 10,277.

45.     Yet covered entities and their contract pharmacies now routinely violate those safeguards. They rarely use "prior authorization protocol[s]" to determine patient eligibility "in advance of" receiving 340B drugs. 61 Fed. Reg. at 43,553. Instead, under the replenishment model used by most covered entities, 340B eligibility is determined only *after* the patient has left the pharmacy—days, weeks, or sometimes even months later—when a third-party entity (often referred to as a "third-party administrator" or "TPA") combs through the pharmacy's prior sales data for 340B-eligible sales. Once the TPA has identified enough 340B-eligible sales to notionally deplete a contract pharmacy's virtual inventory, it places an order on behalf of the covered entity, thereby supposedly "replenishing" the drug that has already been dispensed with another 340B-priced drug. That replenishment order is then shipped directly to the contract pharmacy, which takes title to the drug and puts it in the pharmacy's general inventory, where it can be distributed to *any* pharmacy customer—whether 340B eligible or not.

46.     Thus, under the replenishment model, covered entities rarely, if ever, "maintain title to the drug" through dispensing. 75 Fed. Reg. at 10,277. Instead, replenishment drugs are almost

always delivered directly to the contract pharmacy, without a covered entity ever taking physical possession of the product, and title is almost always transferred to the contract pharmacy upon receipt. Moreover, contract pharmacies rarely act as agents of the covered entity; instead, contract pharmacies are typically independent contractors with respect to the acquisition and sale of 340B drugs, as stated in their agreements with covered entities. Indeed, replenishment sales are often placed on behalf of a covered entity without the covered entity's review or prior approval—or even without the covered entity's awareness.

47.    The prevalence of the replenishment model for contract pharmacy sales has also led to significant abuse. A 2011 report from the Government Accountability Office warned that "[o]perating the 340B program in contract pharmacies creates more opportunities for drug diversion compared to in-house pharmacies." U.S. Gov't Accountability Off., GAO-11-836, *Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement* 28, (Sept. 23, 2011), https://www.gao.gov/assets/330/323702.pdf. The report further found that "HRSA's oversight of the 340B program is inadequate because it primarily relies on participants' self-policing to ensure compliance." *Id.* at 21.

48.    These structural problems have only intensified over time, as the use of the replenishment model and multiple contract pharmacies has become rampant. The 2014 OIG report determined that self-policing by covered entities has been insufficient to stop these abuses, since "most covered entities . . . do not conduct all of the oversight activities recommended by HRSA." 2014 OIG Report at 2. The 2018 GAO Report similarly criticized the continuing "weaknesses in HRSA's oversight [that] impede its ability to ensure compliance with 340B Program requirements at contract pharmacies." 2018 GAO Report at 45.

49.    Indeed, HRSA's own audits of covered entities continue to identify numerous instances of abuse. The 2018 GAO Report observed that "66 percent of the 380 diversion findings in HRSA audits [between 2012 and 2017] involved drugs distributed at contract pharmacies." *Id.* at 44. And based on information from HRSA's website, over 25% of covered entities audited since 2017 have had at least one finding related to contract pharmacy noncompliance. Indeed, out of 199 audits conducted in 2019, HRSA discovered dozens of instances of duplicate discounts, as well as evidence that at least 19 covered entities had permitted diversion of 340B drugs through contract pharmacies. *See* HRSA, *Program Integrity: FY19 Audit Results*, https://www.hrsa.gov/opa/program-integrity/audit-results/fy-19-results.

### AstraZeneca's 340B Policy and Resulting Litigation

50.    AstraZeneca is a global, science-led, patient-focused pharmaceutical company dedicated to transforming the future of healthcare by unlocking the power of what science can do for people, society, and the planet. AstraZeneca is committed to ensuring its life-changing and life-saving products and treatments are available to as many people as possible. AstraZeneca manufactures several products on which it holds patents, which are subject to protections set out in the Patent Restoration Act of 1984 (Hatch Waxman Act) and other federal patent laws.

51.    AstraZeneca has participated in the 340B program since 1993, when it signed its pharmaceutical pricing agreement (PPA) with the Secretary of HHS to enter into the program.

52.    To comply with its obligations under the PPA and the 340B program, AstraZeneca offers its patented products at steep discounts to 340B-eligible covered entities. For example, a prescription for 90 tablets of AstraZeneca's patented product Farxiga retails for hundreds of dollars commercially, but can be purchased for less than a dollar with a 340B discount. Similarly, a prescription for 60 tablets of AstraZeneca's patented product Xigduo retails for hundreds of dollars commercially, but can be purchased for less than a dollar with a 340B discount.

53.    AstraZeneca offers its products to 340B covered entities through wholesalers, just as it offers its products to other purchasers. Covered entities acquire AstraZeneca's 340B-discounted drugs by accepting AstraZeneca's offer—that is, by asking a wholesaler to purchase the AstraZeneca product at the 340B price.

54.    There is no difference between AstraZeneca products that are offered under the 340B program and AstraZeneca products *not* offered under the 340B program, other than the price at which they are offered. AstraZeneca products sold through the 340B program are identical to the same AstraZeneca products sold at commercial price in terms of the physical content of the products, their packaging, labeling, and National Drug Code.

55.    In August 2020, in light of the surge in covered entities accessing 340B-pricing through contract pharmacies—and a sharp increase in accompanying abuse of the program—AstraZeneca announced to covered entities that, effective October 1, 2020, it would revert to the contract pharmacy approach set forth in HRSA's 1996 Guidance.

56.    Under this policy, AstraZeneca continues to make its products available at 340B-discounted prices—in unlimited quantities—to all covered entities. For covered entities that do not maintain their own on-site dispensing pharmacy, AstraZeneca offers discounted drugs for sales at a single contract pharmacy site for each covered entity. But AstraZeneca no longer offers 340B discounts for drugs sold at an unlimited number of contract pharmacies.

57.    AstraZeneca's policy is consistent with the letter and intent of the 340B program—limiting the potential for abuse, while still enabling all covered entities and their patients to continue to access AstraZeneca's medicines at 340B prices. Under AstraZeneca's policy, over 13,000 covered entities that lack an on-site pharmacy have registered a contract pharmacy to which AstraZeneca continues to make 340B discounts available, including numerous covered entities in

Rhode Island. AstraZeneca is committed to working with all covered entities to ensure that every patient can obtain needed medicines at prices they can afford.

58.    Under AstraZeneca's contract pharmacy policy, AstraZeneca has ceased offering 340B discounts for drugs sold at an unlimited number of contract pharmacies. Covered entities remain able to obtain 340B pricing for AstraZeneca products in unlimited quantities, either through their in-house pharmacy or their designated contract pharmacy. Contract pharmacies also remain able to obtain unlimited quantities of AstraZeneca products at rates negotiated outside the 340B program. Patients of covered entities are similarly able to obtain unlimited amounts of AstraZeneca products through covered entities and contract pharmacies.

59.    AstraZeneca's policy does not prevent any pharmacy from receiving deliveries of, or otherwise acquiring, products manufactured by AstraZeneca. Nor does AstraZeneca's policy prevent any covered entity from receiving or acquiring products manufactured by AstraZeneca.

60.    AstraZeneca's policy is not a *delivery* restriction. It does not affect the delivery of AstraZeneca products that have actually been purchased. Indeed, no covered entity has ever purchased an AstraZeneca drug at a 340B price for sales at a non-designated contract pharmacy but had AstraZeneca (or a wholesaler) refuse delivery of that drug.

61.    Instead, AstraZeneca's policy is a restriction on the circumstances under which it *offers* its products at 340B-discounted prices. Under the policy, covered entities are not offered— and are thus unable to purchase—AstraZeneca's drugs at 340B prices for sales at non-designated contract pharmacies. In practice, this means wholesalers are not able to collect 340B prices on AstraZeneca products for sales at non-designated contract pharmacies. But the policy does not prevent covered entities from purchasing the same AstraZeneca products at *commercial* prices, including for sales at a non-designated contract pharmacy.

62.     In response to AstraZeneca's new contract pharmacy policy and other manufacturers' adoption of similar policies, HHS and HRSA issued an Advisory Opinion on December 30, 2020, asserting that the 340B statute requires manufacturers to offer 340B-discounted drugs for sales at unlimited contract pharmacies.

63.     In early 2021, AstraZeneca filed suit in the U.S. District Court for the District of Delaware against HHS and HRSA, challenging the Advisory Opinion. On June 16, 2021, the court issued a detailed opinion finding the Advisory Opinion unlawful. *AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47 (D. Del. 2021). The court concluded that Section 340B "says nothing about the permissible role (if any) of contract pharmacies," and that, in light of this "total omission," the Advisory Opinion's attempt to impose an obligation on AstraZeneca to make discounted drugs available for sales at unlimited contract pharmacies was "legally flawed." *Id.* at 59. The agency withdrew the Advisory Opinion following the court's ruling.

64.     In a second ruling, the court addressed AstraZeneca's challenge to a "violation letter" issued by HRSA, which adopted the same position as the Advisory Opinion. The court again rejected the agency's view that Section 340B obligates drug manufacturers to make 340B-discounted drugs available for unlimited contract pharmacy sales. *AstraZeneca Pharms. LP v. Becerra*, No. 21-cv-27, 2022 WL 484587 (D. Del. Feb. 16, 2022). The court reiterated "key points" from its prior opinion, including that Congress "did not clearly intend for drug manufacturers to be required to facilitate sales of covered drugs for dispensing by an unlimited number of contract pharmacies." *Id.* at *5-*6.

65.     On January 30, 2023, the U.S. Court of Appeals for the Third Circuit affirmed. In a consolidated opinion addressing AstraZeneca's case and appeals in parallel actions by other manufacturers, the Third Circuit held that the Advisory Opinion and violation letter are

"unlawful," and it "enjoin[ed] HHS from enforcing [it] against" AstraZeneca. *Sanofi*, 58 F.4th at 706. The court of appeals also held that AstraZeneca's policy of not offering discounts for sales at unlimited "contract pharmacies do[es] not violate Section 340B." *Id.*

66.     The government neither sought en banc review of the Third Circuit's decision nor filed a petition for certiorari in the U.S. Supreme Court.

67.     On May 5, 2023, the Delaware district court issued a final judgment in AstraZeneca's case, to which the government stipulated. The court's order provides that it is:

a.      "DECLARED that Advisory Opinion 20-06 and the Violation Letter from the Health Resources and Services Administration to Plaintiff AstraZeneca Pharmaceuticals LP (AstraZeneca), dated May 17, 2021 (Violation Letter), are unlawful;

b.      DECLARED that AstraZeneca's policy limiting the use of contract pharmacies under Section 340B of the Public Health Service Act (Section 340B), 42 U.S.C. § 256b—namely, that covered entities may use an in-house pharmacy and, if they do not have an in-house pharmacy, they may use one contract pharmacy—does not violate Section 340B;

c.      ORDERED that the Violation Letter is VACATED as contrary to law pursuant to 5 U.S.C. § 706;

d.      ORDERED that Defendants, including their officers, agents, and employees, are ENJOINED from enforcing against AstraZeneca the agency's reading of Section 340B as requiring delivery of discounted drugs to an unlimited number of contract pharmacies."

Final Judgment at 1, *AstraZeneca*, No. 1:21-cv-27 (D. Del. May 5, 2023), ECF No. 123.

68.     The Third Circuit's ruling and the injunction entitled AstraZeneca to proceed with its lawful contract pharmacy policy.

69.     More recently, AstraZeneca has further modified its contract pharmacy policy to promote program integrity. On October 1, 2024, AstraZeneca updated the policy to require, as a condition of AstraZeneca's offer of 340B-priced drugs, that covered entities must report a limited set of claims data for contract pharmacy dispenses that were replenished using 340B-priced drugs.

70.     AstraZeneca's collection of limited 340B claims data enables AstraZeneca to better detect and prevent violations of the 340B statute's program integrity provisions, including its prohibition on duplicate discounts. A duplicate discount occurs when a manufacturer pays a separate rebate to a payer for a drug that was purchased, credited, or replenished at the 340B price. The 340B statute expressly prohibits duplicate discounts under Medicaid. 42 U.S.C. § 256b(a)(5)(A).

71.     Other types of duplicate discounts are prohibited under payer-manufacturer contracts or other federal laws. For instance, the Inflation Reduction Act requires HHS to "negotiate" with manufacturers for a "maximum fair price" that Medicare will pay for certain drugs, which must include a discount of at least 20%. *Id.* § 1320f-3(a). Under the IRA, each manufacturer must make its drug available at the "maximum fair price"—but *not* if the drug is available at a lower 340B price. *Id.* § 1320f-2(d). To ensure compliance with the IRA and prevent duplicative price reductions under Section 340B and the IRA, the Centers for Medicare and Medicaid Services (CMS) has charged manufacturers with identifying instances where a drug has been dispensed as a 340B drug. *See* CMS, Medicare Drug Pricing Negotiation Final Guidance 58-60 (Oct. 2, 2024), https://www.cms.gov/files/document/medicare-drug-price-negotiation-final-guidance-ipay-2027-and-manufacturer-effectuation-mfp-2026-2027.pdf.

72.     If AstraZeneca's access to claims data is cut off, however, AstraZeneca will lack sufficient information to adequately identify and prevent these and other duplicate discounts. That is because the information AstraZeneca needs to directly connect payer rebates to 340B dispenses is *not* otherwise available to AstraZeneca as part of the 340B purchasing process. And requests by manufacturers for participants in the system (including covered entities and contract pharmacies) to provide the necessary information on a voluntary basis have been consistently spurned.

73.     Manufacturers like AstraZeneca do have a statutory right to conduct audits of covered entities regarding compliance with the statute's anti-duplication requirement, and they may compel the reporting of some data in connection with those audits. 42 U.S.C. § 256b(a)(5)(C). But HRSA regulations provide that a manufacturer may only initiate an audit when it can furnish "documentation which indicates that there is reasonable cause" for such an audit, with "reasonable cause" defined to mean "that a reasonable person could believe that a covered entity may have violated" the prohibitions on diversion or duplicate discounting. 61 Fed. Reg. at 65,409. As a result, a manufacturer must already have "documentation" showing that a covered entity has engaged in duplicate discounting before it may obtain permission to audit that entity.

74.     Covered entities generally do not voluntarily provide manufacturers with the information or data required to establish "reasonable cause." And without the ability to establish reasonable cause, AstraZeneca is effectively unable it access its audit rights.

75.     Given these challenges, AstraZeneca's contract pharmacy policy of October 1, 2024, requires covered entities to submit limited claims data for 340B purchases and dispenses at contract pharmacies. The data that AstraZeneca requires covered entities to submit was already required of pharmacies when they submit claims to payers; and HRSA requires covered entities to

maintain the same data in the regular course of business, with one minor exception for the unique identification number of the covered entity.

76.    In *Novartis Pharmaceuticals*, the D.C. Circuit upheld a manufacturer claims data policy that was materially identical to AstraZeneca's current policy. 102 F.4th at 464. Among other things, the court explained that the request for information was consistent with HRSA guidance, under which "drug manufacturers may require [such] 'standard information' from covered entities." *Id.* at 463 (quoting 59 Fed. Reg. 25,114). The Court also emphasized that "record evidence" showed "the burden of providing the claims data is 'minimal.'" *Id.*

***Rhode Island Enacts Legislation Requiring Manufacturers to Make 340B-Discounted Drugs Available for Unlimited Contract Pharmacy Sales***

77.    On June 20, 2025, the Rhode Island General Assembly passed S. 114, which Governor Daniel McKee signed into law on June 27, 2025. The law took effect on October 1, 2025. S. 114 § 2.

78.    S. 114 provides that a drug manufacturer may not "deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with a 340B covered entity and is authorized under such contract to receive and dispense 340B drugs on behalf of the covered entity unless such receipt is prohibited by the United States [D]epartment of [H]ealth and [H]uman [S]ervices." *Id.* § 5-19.3-5(a). Nor may a manufacturer "interfere with a 340B contract pharmacy that is actively contracted with a 340B covered entity." *Id.* § 5-19.3-5(b). The bill further states that a manufacturer shall not "impose additional terms or limitations not required by federal law as a condition of 340B participation." *Id.* § 5-19.3-5(c). None of those prohibitions includes a geographical limit on their coverage.

79.    S. 114 defines its basic terms by reference to federal law. It defines "340B drug" to mean "a drug that has been subject to any offer for reduced prices by a manufacturer pursuant to 42 U.S.C. § 256b and is purchased by a covered entity as defined in 42 U.S.C. § 256b(a)(4)." *Id.* § 5-19.3-2(1). It defines "340B covered entity" to mean an "entity participating or authorized to participate in the federal 340B drug discount program, as described in 42 U.S.C. § 256b." *Id.* § 5-19.3-2(3).

80.    S. 114 does not prohibit diversion or otherwise require that drugs purchased at 340B-discounted prices be dispensed only to patients of a covered entity. *See* 42 U.S.C. § 256b(a)(5)(B) ("[A] covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity."). Nor does the statute account for HRSA's enforcement authority or for the congressionally mandated procedures for administrative dispute resolution. *See id.* § 256b(d)(3).

81.    S. 114 empowers the Rhode Island Auditor General to "[i]nvestigate complaints and take appropriate actions to ensure compliance with" the statute. S. 114 § 5-19.3-7.

82.    Additionally, S. 114 provides that any "act prohibited by" the statute constitutes a violation of Rhode Island's Unfair Sales Practices Act, *id.* § 5-19.3-8(b), and that a violation of Rhode Island's Deceptive Trade Practices Act takes place "each time" an act "prohibited" by the statute occurs, *id.* § 5-19.3-8(a). The Deceptive Trade Practices Act, in turn, authorizes the Attorney General to seek civil penalties up to $10,000 for each violation. R.I. Stat. § 6-13.1-8. These statutes also create a private right action under which a private party may seek "actual damages or five hundred dollars ($500), whichever is greater," as well as treble damages and equitable relief. R.I. Stat. §§ 6-13-6, 6-13.1-5.2(a).

## LEGAL ALLEGATIONS

### *S. 114 Is Preempted by Section 340B*

83.     The Supremacy Clause of the U.S. Constitution provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof," are "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The doctrine of federal preemption that arises out of the Supremacy Clause requires that "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 51 (1st Cir. 2024) (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962)).

84.     Under the Supremacy Clause, S. 114 is preempted by Section 340B because its mandates for drug manufacturers, and its associated enforcement mechanisms, conflict with the 340B statute and impermissibly interfere with important federal policies and objectives.

85.     *First*, by requiring drug manufacturers to offer 340B pricing for unlimited contract pharmacy sales—thereby drastically increasing their costs of participating in the 340B program—S. 114 impermissibly "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Pub. Int. Legal Found.*, 92 F.4th at 52 (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)).

86.     Covered entities, and their contract pharmacy partners, use 340B discounts to "turn a profit," by reselling discounted drugs at full price to insured patients. *Sanofi*, 58 F.4th at 699. But such discounts impose corresponding costs on drug manufacturers. Prior to S. 114's enactment, manufacturers were obligated to offer such discounts only for sales directly to covered entities themselves: Federal courts determined that Section 340B does *not* obligate manufacturers to "help [covered entities] maximize their 340B profits" by offering discounts for contract pharmacy sales. *Id.* at 704; accord *Novartis*, 102 F.4th at 459.

87.     S. 114 is designed to counteract those rulings, by requiring manufacturers who participate in the 340B program to offer those very discounts under state law. Under the law, a manufacturer must offer 340B discounts for unlimited contract pharmacy sales—despite the Third and D.C. Circuits' holdings that federal law imposes no such requirement. Imposing such a requirement will enable covered entities and their associated contract pharmacies to "squeeze [more] revenue out of" the federal program. *Id.* at 704. But in so doing, the law imposes a corresponding cost on manufacturers, significantly increasing the burdens of participating in a federal program beyond those that Congress intended when it crafted the program.

88.     S. 114 will cause substantial economic harm to AstraZeneca, which would lose approximately $300,000 dollars per month as a result of being forced by the law to provide access to 340B discounts for unlimited contract pharmacy sales.

89.     In effect, Rhode Island has used manufacturers' participation in the federal 340B program as leverage to extract additional money from them under state law. The result is to "exert an extraneous pull on the scheme established by Congress," thus "skew[ing]" the "delicate balance of statutory objectives." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348, 353 (2001).

90.     Other States have defended similar contract pharmacy laws by claiming that they regulate only drug distribution, which the 340B statute does not address.

91.     Even if that were true, and S. 114 regulated delivery rather than pricing, that would not save the law from preemption. Imposing a costly new delivery obligation on transactions under a federal program just as readily "discourage[s]" participation in the program and impermissibly disrupts Congress's careful design. *Id.* at 350.

92.     But in fact it is *not* true: Although it refers to the "acquisition" and delivery" of 340B drugs, S. 114 regulates drug *pricing*. The law dramatically expands the range of transactions

in which manufacturers must provide access to their products at prices that have been reduced under the formula prescribed by Section 340B.

93.     By prohibiting manufacturers from restricting 340B-priced sales to contract pharmacies, S. 114 on its face regulates pricing—and insofar as manufacturers are affected, *only* regulates pricing. The statute does not affect any aspect of drug acquisition or delivery, such as packaging requirements, shipping conditions, shipping costs, or other logistics and specifications. To the contrary, whether a contract pharmacy pays a commercial price or the 340B price is the *only* thing that distinguishes a sale that complies with S. 114 from a sale that violates S. 114. The law thus forces manufacturers to offer 340B-discounted prices for unlimited contract pharmacy sales, even though manufacturers like AstraZeneca would otherwise refuse to offer such pricing under their contract pharmacy policies.

94.     The Supremacy Clause prohibits States from engrafting new, costly state law obligations like S. 114 onto an existing federal program and overturning the careful balance of benefits and burdens that Congress established.

95.     The burden imposed by S. 114 on AstraZeneca's participation in the 340B program is compounded by the laws of several other states, which have recently adopted comparable statutes. Arkansas, Colorado, Kansas, Louisiana, Maryland, Minnesota, Mississippi, Nebraska, New Mexico, North Dakota, Oklahoma, Oregon, North Dakota, South Dakota, Tennessee, Utah, Vermont, and West Virginia have all passed similar—but somewhat different—laws requiring manufacturers to make 340B discounts available for contract pharmacy sales. AstraZeneca now must navigate complying with all these laws and their slight variations, while still balancing its 340B participation and the federal requirements.

96.    *Second*, in addition to preventing States from burdening participation in federal programs, the Supremacy Clause prohibits States from establishing parallel regimes that encroach on the federal government's authority to set and define federal enforcement priorities. *See id.* at 349-51.

97.    S. 114 directly interferes with the robust federal enforcement regime that Congress has enacted for the 340B program, which includes the ADR process, required auditing provisions for manufacturers and covered entities, and the possibility of civil monetary penalties in the event of a manufacturer overcharge or diversion by a covered entity.

98.    Indeed, S. 114 expressly *prevents* manufacturers from using the federal enforcement regime. "[M]anufacturers are required to audit a covered entity prior to filing an ADR claim," 89 Fed. Reg. at 28,645; *see* 42 U.S.C. § 256b(d)(3)(B)(iv), but a manufacturer must have "documentation" indicating diversion or duplicate discounts before it may initiate such an audit, 61 Fed. Reg. at 65,409. Yet S. 114 restricts manufacturers' ability to collect necessary claims data regarding the purchase and dispensing of 340B drugs by covered entities and contract pharmacies, because it forbids them from requiring the submission of such data as a condition of their "offer" under the 340B program. *See* S. 114 § 5-19.3-5(c); *see also id.* § 5-19.3-3(a)(5).

99.    Without this claims data, manufacturers are unable to adequately identify duplicate discounts or diversion. They are likewise significantly hampered in establishing the "reasonable cause" required to conduct audits of covered entities, as is their statutory right. *See* ¶¶ 73-74, *supra*.

100.    "By restricting the very method by which data collection is made," S. 114 "frustrates drug manufacturers' ability to take the initial steps necessary to start the very audit required to access the alternative dispute resolution system." *PhRMA v. Morrisey*, 760 F. Supp. 3d 439, 453 (S.D. W. Va. 2024).

101.    The data-collection restriction conflicts with federal law in other ways, too. Under the Inflation Reduction Act, Congress has instructed HHS to "negotiate" with manufacturers regarding the "maximum fair price" that Medicare will pay for certain drugs. 42 U.S.C. § 1320f-3(a). A manufacturer whose drug is selected for "negotiation" must make the drug available at the "maximum fair price" unless it is available at a lower 340B price. *Id.* § 1320f-2(d). To ensure compliance with the IRA and to prevent duplicative price reductions under Section 340B and the IRA, the Centers for Medicare and Medicaid Services (CMS) has charged manufacturers with identifying instances where a drug has been dispensed as a 340B drug. *See* CMS, Medicare Drug Pricing Negotiation Final Guidance 58-60 (Oct. 2, 2024), https://www.cms.gov/files/document/medicare-drug-price-negotiation-final-guidance-ipay-2027-and-manufacturer-effectuation-mfp-2026-2027.pdf. But S. 114 restricts manufacturers' ability to obtain the data that manufacturers need to make those identifications. It therefore inhibits manufacturers' ability to avoid such unlawful duplicate price reductions under Section 340B and the IRA, conflicting with federal law. *See* 42 U.S.C. § 1320f-2(d) (providing that manufacturers "shall not be required" to provide duplicate discounts).

102.    Recognizing that manufacturers who lack claims data run a significant risk of paying duplicate discounts, moreover, HRSA recently proposed a pilot program under which manufacturers may first receive sales data from covered entities before paying 340B rebates. *See* 90 Fed. Reg. 38,165 (Aug. 7, 2025). As HRSA explained, obtaining such data helps manufacturers "address 340B and Maximum Fair Price (MFP) deduplication" under the IRA, and it also "facilitate[s] . . . the prevention of 340B Medicaid duplicate discounts and diversion." *Id.* at 38,165. The data identified as appropriate for a manufacturer to receive under the pilot program is precisely the same data that S. 114's data-collection restriction forbids them to request. *See id.* at 38,167.

S. 114 thus precludes manufacturers like AstraZeneca from participating in the pilot program, because it forbids them from collecting the data that the pilot program contemplates.

103.    S. 114 interferes with enforcement of the 340B program in yet another respect: It requires state officials to adjudicate disputes about the meaning and application of federal terms and provisions.

104.    S. 114 enables both the Rhode Island Attorney General and Auditor General to ensure compliance and enforce violations of the statute. S. 114 §§ 5-19.3-7, 5-19.3-8. The Attorney General is empowered to level civil fines up to $10,000 per violation of S. 114, *id.* § 5-19.3-8; R.I. Stat. § 6-13.1-8, and a violation of Rhode Island's Deceptive Trade Practices Act occurs "each time a prohibited act is committed," S. 114 § 5-19.3-8.

105.    S. 114 also enables private entities to file suit for damages and injunctive relief under the Deceptive Trade Practices Act and Unfair Sales Practices Act. S. 114 § 5-19.3-8; R.I. Stat. §§ 6-13-6, 6-13.1-5.2(a).

106.    These procedures and remedies differ sharply from the ones available under the federal 340B program, and they reach well beyond what Congress permitted. *See, e.g.*, 42 U.S.C. § 256b(d). S. 114 authorizes state officials and private parties in Rhode Island to sidestep the enforcement mechanism Congress expressly established for the 340B program—the ADR system—and instead pursue remedies that the federal scheme does not permit.

107.    S. 114 interferes with enforcement of the 340B program in another respect: It requires state officials to adjudicate disputes about the meaning and application of federal terms and provisions.

108.    In any state enforcement proceeding, a state adjudicator would be required to consider and resolve questions of federal law in order to determine whether a manufacturer has

violated S. 114. Among other things, the adjudicator would need to decide whether the 340B drugs to which the manufacturer allegedly denied or restricted access were intended for a "a patient of the entity," as required for eligibility under the 340B program. 42 U.S.C. § 256b(a)(5)(B). That question turns on the definition of "patient of the entity" under federal law. The adjudicator would also be required to determine whether a particular covered entity continues to qualify for participation in the 340B program, which depends on whether the entity sells or transfer 340B drugs to anyone other than its patients or seeks duplicate discounts. *See id.* § 256b(a)(4) (defining "'covered entity'" to "mean[] an entity that meets the requirements described in paragraph (5)," which includes the prohibitions on diversion and duplicate discounts). These issues are often disputed and have been the subject of federal litigation. *See, e.g.*, *Amgen Inc. v. Becerra*, No. 1:24-cv-3571 (D.D.C. filed Dec. 20, 2024); *Albany Med Health Sys. v. HRSA*, No. 1:23-cv-3252 (D.D.C. filed Oct. 31, 2023).

109.    In *Astra USA, Inc. v. Santa Clara County*, the Supreme Court held that private entities may not bring actions under state contract law to enforce the provisions of manufacturers' 340B pharmaceutical pricing agreements. 563 U.S. at 113-14. "Congress made HHS administrator of … the 340B Program." *Id.* at 120. Suits by private entities, the Court explained, "would undermine the agency's efforts" to administer the program "harmoniously and on a uniform, nationwide basis." *Id.* "With HHS unable to hold the control rein, the risk of conflicting adjudications would be substantial." *Id.*

110.    S. 114 makes that risk unavoidable. The federal administrative process assigns responsibility to HRSA to resolve disputes related to "overcharge[s]," which include claims that a manufacturer has "limited [a] covered entity's ability to purchase covered outpatient drugs at or

below the 340B ceiling prices." 42 C.F.R. §§ 10.3, 10.21. S. 114 requires state officials to resolve the same disputes.

111.    By inserting Rhode Island and its officials into the program that Congress adopted, the law frustrates the accomplishment of Congress's objectives and interferes with Congress's chosen method of oversight.

### S. 114 Is Preempted by Federal Patent Law as Applied to AstraZeneca's Patented Products

112.    As applied to AstraZeneca's patented products, S. 114 is also preempted by the federal patent laws because it regulates the prices at which patented drugs may be sold.

113.    The Constitution gives Congress exclusive authority to establish a system of incentives "[t]o promote the Progress of Science and useful Arts." Art. I, § 8, cl. 8. Under the federal patent law, inventors are "impelled to invest in creative effort" on the promise that they will obtain "a federally protected 'exclusive right'" to sell their inventions for a limited period. *BIO*, 496 F.3d at 1372. The public can benefit from immediate access to new inventions during the exclusivity period; and after the period expires, the public gets "lower price[s] through unfettered competition." *Id.* at 1373. The States are not free to upset that finely calibrated system: "Where it is clear how the patent laws strike that balance in a particular circumstance, that is not a judgment the States may second-guess." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152 (1989).

114.    State laws that cap or fix the prices at which patented drugs may be sold are accordingly preempted by federal patent law, as the Federal Circuit has explained, because they "re-balance the statutory framework of rewards and incentives . . . in effect diminishing the reward to patentees in order to provide greater benefit to . . . drug consumers." *BIO*, 496 F.3d at 1374. In *BIO*, the Federal Circuit struck down a District of Columbia law that prohibited patented drugs from "being sold in the District for an excessive price." *Id.* at 1365. The court explained that,

notwithstanding "the District's judgment" that drug manufacturers were charging "excessive prices" that "threaten[ed] the health and welfare of the residents of the District as well as the District government's ability to ensure that all residents receive the health care they need," the law was "contrary to the goals established by Congress in the patent laws." *Id.* at 1365, 1374 (quoting D.C. Code § 28-4551). The District's law was therefore preempted because "[t]he underlying determination about the proper balance between innovators' profit and consumer access to medication . . . is exclusively one for Congress to make." *Id.* at 1374.

115.    The same analysis applies to S. 114. Like the District of Columbia law invalidated in *BIO*, S. 114 restricts the prices at which manufacturers must offer their patented drugs by requiring them to make 340B discounts available for unlimited contract pharmacy sales. Whereas Section 340B caps drug prices with respect to a manufacturer's offer to sell its drugs to a limited set of specifically enumerated covered entities, S. 114 purports to extend those price caps to a category of sales—unlimited contract pharmacy sales—where federal courts have held that manufacturers are *not* required to offer them under the federal program. Accordingly, the law functions as a price cap for unlimited contract pharmacy sales, impermissibly constraining manufacturers' "opportunity" to take advantage of the benefit of exclusivity conferred by Congress "during the patent's term." *Id.* at 1372.

116.    S. 114 is thus preempted by federal patent law as applied to AstraZeneca's patented products. States are not permitted to set the prices of patented drugs or to "re-balance" the "rewards and incentives" embodied in the federal patent laws, as Rhode Island has done here. *Id.* at 1374.

### *S. 114 Violates the Contracts Clause*

117.    S. 114 also violates the Contracts Clause of the U.S. Constitution. Article I, section 10, clause 1 of the Constitution provides that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." Courts have interpreted the Contracts Clause to require a three-part

inquiry to balance the State's obligation not to impair contracts with the State's interest in public welfare. *See United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuno*, 633 F.3d 37, 41 n.4 (1st Cir. 2011). First, the court asks "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *All. of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 42 (1st Cir. 2005) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)). Second, if the court finds substantial impairment, it must examine whether the State has a significant and "legitimate public purpose" behind the law. *Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178, 191 (1st Cir. 1999) (quoting *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983)). Third, if the State presents a legitimate justification for the impairment, the court must determine "whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." *Energy Rsrvs. Grp.*, 459 U.S. at 412 (cleaned up).

118.    S. 114 fails at every stage of this test. S. 114 substantially impairs a contractual relationship. As explained above, the 340B program operates through contracts, which are called pharmaceutical pricing agreements (or "PPAs"). PPAs are "uniform agreements that recite the responsibilities § 340B imposes . . . on drug manufacturers and the Secretary of HHS." *Astra USA*, 563 U.S. at 113. While PPAs are not "transactional, bargained-for contracts," *id.*, they nonetheless announce the parties' rights and obligations like any other contract, and manufacturers like AstraZeneca are entitled to rely on the PPA's terms when developing their business. Among those terms is the requirement that manufacturers offer discounted drugs only for sales to a specifically delineated set of "covered entities." As the Third Circuit held, and the D.C. Circuit later underscored, neither the 340B statute nor the PPA requires AstraZeneca to make 340B discounts

available for sales at "an unlimited number of contract pharmacies." *Novartis Pharms.*, 102 F.4th at 461 (quoting *Sanofi Aventis*, 58 F.4th at 706).

119.    S. 114 operates as a substantial impairment of AstraZeneca's PPA with the HHS Secretary. AstraZeneca joined the 340B program with the expectation and understanding that it would be required to offer discounts only for a limited category of sales, and it accepted that obligation in reliance on the federal government's careful balance of the costs and benefits of participating in the federal program. The law seeks to unilaterally expand AstraZeneca's obligations under that contract—without AstraZeneca's consent—by requiring AstraZeneca to offer discounts for an entirely new category of sales: contract pharmacy sales.

120.    The U.S. Supreme Court has held that similar expansions of beneficiaries to a contract constitute substantial impairment under the Contracts Clause. *See Allied Structural Steel*, 438 U.S. at 245-46 (Contracts Clause prohibited State from requiring company to provide additional pension benefits after it had agreed to provide pension benefits under specific contractual conditions); *see also United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 630 (5th Cir. 2010) (Contracts Clause prohibited state from enacting legislation increasing obligations on companies that had agreed to insure state employees under specific conditions).

121.    Any justification Rhode Island might offer for S. 114 would be insufficient under the Contracts Clause. Rhode Island cannot claim that its law is necessary to provide access to 340B drugs to covered entities and their patients, because AstraZeneca's policy already ensures that every covered entity is offered those drugs at a discounted price. Indeed, AstraZeneca's policy goes further, allowing covered entities to designate a single contract pharmacy if it does not have an on-site pharmacy.

122.   Rhode Island has no legitimate justification for requiring discounts for unlimited contract pharmacy sales, which will advance the economic interests of for-profit entities at the expense of companies like AstraZeneca, particularly where Congress itself has not required them.

123.   Nor can Rhode Island justify S. 114 as a cost-reduction mechanism for patients. Nothing in the law requires that discounts must be passed on to patients, and in fact studies show that most 340B discounts to contract pharmacies are *not* passed on to patients, who must pay full price for their drugs. *See* ¶ 41, *supra*.

124.   Finally, even if Rhode Island could articulate a legitimate justification for S. 114's impairment of AstraZeneca's PPA, that justification would not be reasonable and necessary to achieve the State's goals.

### S. 114 Violates the Takings Clause

125.   The Takings Clause of the U.S. Constitution provides that "private property" may not "be taken for public use, without just compensation." U.S. Const. amend. V.

126.   Under the Takings Clause, although the government may take private property "for public use" so long as it pays "just compensation," the government may never take private property for *private* use, regardless of the amount of compensation paid. As the U.S. Supreme Court has explained, "the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*," a prohibition that applies regardless of whether "*A* is paid just compensation." *Kelo*, 545 U.S. at 477. Such takings for private use are always unlawful, since "[n]o amount of compensation can authorize such action." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005).

127.   S. 114 takes the private property of manufacturers like AstraZeneca for private, not public, use. The law forces manufacturers to offer their prescription drugs to other private (non-governmental) entities—namely, to covered entities and the pharmacies with which they

contract—at prices that AstraZeneca would not otherwise offer (and is not required to offer under federal law). Once the 340B-priced offer compelled by S. 114 has been accepted by a covered entity, AstraZeneca has no choice under the law but to relinquish custody, title, and control of its product.

128.    This forced transfer would be unlawful even if manufacturers were paid just compensation for these contract pharmacy sales. *See id.* But manufacturers are *not* justly compensated for the forced transfers covered by the law: The law requires manufacturers to make these transfers at steeply discounted prices, well below fair market value.

129.    This forced transfer results in the "physical appropriation" of manufacturers' prescription drugs by contract pharmacies and covered entities, and it therefore constitutes "a *per se* taking." *Cedar Point Nursery v. Hasid*, 594 U.S. 139, 149 (2021).

130.    S. 114 accordingly violates the Takings Clause of the U.S. Constitution.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Declaratory/Injunctive Relief – S. 114 is Preempted by Section 340B
Supremacy Clause, U.S. Const. art. VI, cl. 2)**

131.    Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

132.    The Supremacy Clause, U.S. Const. art. VI, cl. 2, prohibits a State from enacting any law "which interferes with or is contrary to federal law." *Pub. Int. Legal Found.*, 92 F.4th at 51 (quoting *Free*, 369 U.S. at 666). The mandates imposed on drug manufacturers by S. 114, and its associated enforcement mechanisms, are preempted by the 340B statute under the Supremacy Clause.

133.    S. 114 creates an obstacle to the accomplishment and execution of Congress's objectives for the 340B statute. It imposes significant new costs for participating in a federal benefits program, thereby "exert[ing] an extraneous pull on the scheme established by Congress" and "skew[ing]" the "delicate balance of statutory objectives." *Buckman*, 531 U.S. at 348, 353. In addition, Section 340B includes a comprehensive regime for enforcement and management of the program, which includes the ADR process, audits, and civil monetary penalties. S. 114's attempt to insert into Congress's program a layer of enforcement by state officials under Rhode Island law frustrates Congress's purposes and interferes with the carefully specified federal regime it created.

134.    For these reasons, S. 114's provisions requiring manufacturers to offer 340B discounts for unlimited contract pharmacy sales, barring manufacturers from obtaining claims data from covered entities and pharmacies, banning rebate models, and empowering Defendants and private plaintiffs to pursue purported violations of the statute, are preempted by federal law under the Supremacy Clause.

### SECOND CLAIM FOR RELIEF

### (Declaratory/Injunctive Relief – S. 114 is Preempted by Federal Patent Law Supremacy Clause, U.S. Const. art. VI, cl. 2)

135.    Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

136.    The Supremacy Clause, U.S. Const. art. VI, cl. 2, prohibits a State from enacting any law "which interferes with or is contrary to federal law." *Pub. Int. Legal Found.*, 92 F.4th at 51 (quoting *Free*, 369 U.S. at 666). Moreover, the Constitution assigns exclusive authority to regulate patents to the U.S. Congress. With respect to pharmaceuticals, Congress has enacted comprehensive legislation establishing the scope of patent rights under federal law. Thus, state laws that cap or fix drug prices are preempted by federal patent law because they "re-balance the

statutory framework of rewards and incentives . . . in effect diminishing the reward to patentees in order to provide greater benefit to . . . drug consumers." *BIO*, 496 F.3d at 1374.

137.    S. 114 requires manufacturers to make 340B discounts available for unlimited contract pharmacy sales, and it empowers Defendants to pursue purported violations of the statute. As applied to AstraZeneca's patented products, those provisions are preempted by federal patent law under the Supremacy Clause.

138.    The obligation imposed by S. 114 on manufacturers—to offer 340B discounts for unlimited contract pharmacy sales—caps the prices at which manufacturers can sell their patented drugs and constrains manufacturers' "opportunity" to take advantage of the benefits of exclusivity "during the patent's term." *Id.* at 1372. The law therefore impermissibly seeks to "re-balance" the "rewards and incentives" embodied in the federal patent laws in a manner that is beyond a state's powers. *Id.* at 1374. S. 114 is therefore preempted by federal patent law under the Supremacy Clause as applied to AstraZeneca's patented products.

### THIRD CLAIM FOR RELIEF

### (Declaratory/Injunctive Relief – S. 114 Violates the Contracts Clause, U.S. Const. art. I, § 10, cl. 1)

139.    Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

140.    Under the Contracts Clause, U.S. Const. art. I, § 10, cl. 1, "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." The Contracts Clause thus prohibits States from enacting legislation that "operate[s] as a substantial impairment of a contractual relationship." *United Auto.*, 633 F.3d at 41 (quoting *Energy Rsrvs. Grp.*, 459 U.S. at 411).

141.    S. 114 violates the Contracts Clause. It substantially impairs AstraZeneca's PPA with the HHS Secretary by requiring AstraZeneca to offer 340B discounts for unlimited contract

pharmacy sales, thus purporting to substantially expand AstraZeneca's obligations under the agreement beyond what the agreement itself provides.

142.    Rhode Island has no valid justification for impairing AstraZeneca's PPA. AstraZeneca's policy ensures that every covered entity is offered 340B drugs at statutorily required prices. The policy also allows covered entities without an on-site pharmacy to utilize a single contract pharmacy. Compelling AstraZeneca to provide 340B-discounted drugs for unlimited contract pharmacy sales advances the economic interests of private entities at AstraZeneca's expense, with little to no benefit to 340B patients.

143.    Even if Rhode Island could identify a legitimate justification for impairing AstraZeneca's PPA, it would not be reasonable and necessary to achieve the State's goals.

144.    S. 114 is also unconstitutional under the Contracts Clause to the extent it requires AstraZeneca to offer 340B discounts for sales at contract pharmacies that do not qualify as covered entities, and which therefore are not included within the anticipated or actual scope of the PPA that AstraZeneca signed with the HHS Secretary.

### FOURTH CLAIM FOR RELIEF

**(Declaratory/Injunctive Relief – S. 114 Violates the Takings Clause,
U.S. Const., amend. V)**

145.    Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

146.    Under the Takings Clause of the Fifth Amendment of the U.S. Constitution, the government may not take "private property" for private use—such as requiring the transfer of ownership from one private party to another—even if just compensation is paid.

147.    S. 114 takes private property for private use by forcing manufacturers to transfer 340B-discounted drugs—including relinquishing title and control of the drugs—to private, non-

governmental entities (covered entities and their contract pharmacies) at non-commercial prices that AstraZeneca would not otherwise offer.

148.    S. 114 also denies manufacturers just compensation because it requires that their drugs be transferred to these private entities at below-market prices.

149.    The forced transfer of drugs under S. 114 constitutes a taking per se.

150.    S. 114 is therefore unconstitutional under the Takings Clause.

## PRAYER FOR RELIEF

**NOW, THEREFORE,** AstraZeneca requests a judgment in its favor against the Rhode Island Attorney General and Auditor General as follows:

A.    Declare that S. 114 is preempted by Section 340B and is therefore null, void, and unenforceable;

B.    Declare that S. 114 is preempted by federal patent law, and therefore null, void, and unenforceable, as applied to AstraZeneca's patented products;

C.    Declare that S. 114 is unconstitutional as applied to AstraZeneca under the Contracts Clause of the U.S. Constitution;

D.    Declare that S. 114 is unconstitutional as applied to AstraZeneca under the Takings Clause of the U.S. Constitution;

E.    Declare that AstraZeneca is not required to offer 340B discounts for unlimited contract pharmacy sales under Rhode Island law;

F.    Issue preliminary and permanent injunctive relief preventing Defendants from implementing or enforcing S. 114 against AstraZeneca or any of its affiliates, officers, agents, or contractors;

G.    Issue preliminary and permanent injunctive relief preventing Defendants from seeking civil penalties, equitable relief, or any other remedy based on any alleged

violation of S. 114 by AstraZeneca or any of its affiliates, officers, agents, or contractors;

H.    Award AstraZeneca reasonable attorneys' fees and costs, as appropriate; and

I.    Grant such other and further relief as the Court may deem appropriate.

Dated: November 25, 2025

Respectfully submitted,
ASTRAZENECA PHARMACEUTICALS LP
By Its Attorneys,

/s/ *Sally P. McDonald, Esq.*
Sally P. McDonald, Esq. (#8265)
Justin T. Shay, Esq. (#2781)
Cameron & Mittleman LLP
301 Promenade Street
Providence, RI 02908
Tel.: (401) 331-5700
Fax: (401) 331-5787
smcdonald@cm-law.com
jshay@cm-law.com

Allon Kedem*
Jeffrey L. Handwerker*
Samuel I. Ferenc*
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
(202) 942-5000
(202) 942-5999 - fax
allon.kedem@arnoldporter.com
jeffrey.handwerker@arnoldporter.com
sam.ferenc@arnoldporter.com

Carmela T. Romeo*
Nicole L. Masiello*
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-8000
(212) 836-8689 - fax
carmela.romeo@arnoldporter.com
nicole.masiello@arnoldporter.com

* *Applications to be admitted pro hac vice forthcoming*

p:\docs\ASTRA\50593\FORM\2JX6660.DOCX